Metz, Respondent, vs. Rath and another, Appellants.

*January 9—February 5, 1957.*

14

For the appellants there was a brief by *Rogers & Owens* of Portage, and oral argument by *Bruce J. Rogers*.

For the respondent there was a brief by *Hugh F. Oldenburg* of Madison, attorney, and *Walker & Bieber* of Portage of counsel, and oral argument by *Mr. Oldenburg* and *Miss Dorothy Walker*.

CURRIE, J.    On this appeal we are confronted with the following issues:

(1) Is there any credible evidence to sustain the jury's findings that the defendant Rath was guilty of causal negligence as to both lookout and speed?

(2) Did the trial court err in failing to change the jury's answer of "No" to "Yes" to the question which inquired as to whether the pedestrian Metz's negligence as to lookout was a substantial factor in causing the accident?

(3) Was Metz's negligence equal to or greater than that of Rath as a matter of law?

(4) Did the trial court err in instructing the jury that the sudden-emergency doctrine was applicable as to Metz?

The accident occurred in the middle of the forenoon of a bright clear summer day. South Leeds is a hamlet consisting of a few houses, a store, and a garage fronting on U. S. Highway 51 which runs in a general northerly and southerly direction. This highway at the place of the accident has a black-top pavement 23.4 feet wide. Both the store and the garage are located on the west side of such highway. County Trunk Highway K intersects Highway 51 at right angles

in South Leeds, the store being to the south and the garage to the north of such intersection.

On the morning of the accident Metz had parked his platform truck loaded with tires on the east shoulder of Highway 51 facing north directly across from the garage and about 81.5 feet north of the center of the intersection with County Trunk Highway K. To the southward Highway 51 inclined upward in a gradual slope to the crest of a knoll some 531 feet to the south of Metz's parked truck. The plaintiff's key witness was a Mrs. Lawrence Hanson, who, at the time of the accident, was seated in the driver's seat of an automobile parked in front of the store facing north. The distance from where Mrs. Hanson was seated was approximately 234 feet to the south of the parked Metz truck.

The material portions of Mrs. Hanson's testimony are as follows: She observed Metz walk from the cab back along the west side of his truck with some papers tucked under his arm. On arriving at the rear of the truck he took two tires from the back of the truck and started to cross the highway. At that instant a pickup truck was approaching on Highway 51 from the south and Metz stepped back to let this truck pass by. After such truck had passed, Metz again started across the highway toward the garage. At the same instant as Metz started to cross the highway this second time, Mrs. Hanson saw the Rath station wagon, which was approaching from the south. Such station wagon was then either opposite to where she was seated or had arrived at the intersection. Metz had taken three or four steps onto the black-top pavement and then "just froze in his tracks and . . . for a second or two . . . just stood that way." He then took a running step or jump to the west. As Metz made such jump to the west the Rath station wagon also veered to the west and the impact occurred. Mrs. Hanson did not see the actual impact because the station wagon was then between her and Metz. However, she heard a thud and saw Metz's body

somersault in the air and also saw the papers and one of the tires which he had been carrying. She placed the point of impact at about the center of the pavement.

No vehicle was in sight approaching from the north at the time of the accident. Rath testified that one vehicle had been traveling north ahead of him immediately prior to the accident and estimated the distance between it and his station wagon at 1,200 feet. This undoubtedly was the pickup truck observed by Mrs. Hanson. The posted speed limit in South Leeds is 45 miles per hour, and Rath testified that he was traveling at a speed of 40 to 45 miles per hour as he proceeded through South Leeds. He also admitted having seen the parked Metz truck as he came over the crest of the knoll to the south but stated that no person was then to be seen about the truck. According to Rath's testimony he did not see Metz at all until the latter suddenly appeared in the highway about 20 to 30 feet ahead of Rath's station wagon. Rath then immediately applied his brakes and swerved to the left in an unsuccessful attempt to avoid striking Metz.

On the basis of the foregoing facts there was ample credible evidence to support the jury's findings that Rath was causally negligent as to lookout. The jury would be warranted in concluding that Rath should have seen Metz sooner than he did, and that, if he had, he then would have had time to have taken effective steps to avoid striking Metz.

While there is no evidence that Rath was exceeding the posted speed limit of 45 miles per hour, this did not preclude the jury from finding him causally negligent as to speed. Sec. 85.40 (2) (a), Stats., provides as follows:

"(2) (a) No person shall operate a vehicle at a speed greater than is reasonable and prudent under conditions and having regard for the actual and potential hazards then existing and the speed of the vehicle shall be so controlled as may be necessary to avoid colliding with any object, person,

vehicle, or other conveyance on or entering the highway in compliance with legal requirements and using due care."

The jury may well have determined that under the conditions which prevailed at the time and place of this accident a speed of 40 to 45 miles per hour on the part of Rath was negligent in view of the "actual and potential hazards then existing." This is because the jury may have considered that a truck loaded with tires parked across the highway from a public garage should in itself have brought to Rath's attention the possibility of a pedestrian traversing the space between such truck and the garage. The first warning sign of a speed zone ahead is posted 2,000 feet south of the intersection of Highways 51 and K, while the first sign reading "45 Mile Speed Limit" is 1,000 feet south thereof. The jury may also have deemed a speed of 40 to 45 miles per hour excessive at the point of such intersection in the heart of the hamlet of South Leeds under conditions prevailing on the morning of the accident.

It is, therefore, our conclusion that defendant is not entitled to have plaintiff's complaint dismissed on the ground that there is no credible evidence to support the findings of causal negligence against the defendant Rath.

We next will consider the question of whether it was error for the trial court not to have changed the answer of the jury from "No" to "Yes," to the question, which inquired as to whether the negligence with respect to lookout on the part of Metz, was a substantial factor in causing the accident. We deem that such negligence on the part of the pedestrian Metz as to lookout in attempting to cross the highway in the path of the oncoming station wagon, without making a sufficient observation of its approach, was causal as a matter of law. Other pedestrian cases in which it was held that the pedestrian was causally negligent as a matter of law in failing to keep a proper lookout are *Merkle v. Behl* (1955), 269

Wis. 432, 69 N. W. (2d) 459; *Fessler v. Northwestern Nat. Casualty Co.* (1953), 265 Wis. 14, 60 N. W. (2d) 387; *Mertens v. Lake Shore Y. C. & T. Co.* (1928), 195 Wis. 646, 218 N. W. 85; and *Brickell v. Trecker* (1922), 176 Wis. 557, 186 N. W. 593.

Because of the required change of the answer to this causation question there is the possibility that the jury would have made a different apportionment of negligence than they did in answering the comparative-negligence question of the verdict. This would necessitate a new trial unless this court should determine as a matter of law that the negligence of Metz was equal to or greater than the negligence of Rath. Counsel for the defendants strenuously contend that we should so determine. However, this court has rather consistently held that in this type of pedestrian accident case the comparison is for the jury. See *Wells v. Dairyland Mut. Ins. Co.* (1957), 274 Wis. 505, 80 N. W. (2d) 380, and cases cited therein. There are no special circumstances in the instant case which distinguish it from such other cases.

In charging the jury, the learned trial court gave an instruction on the sudden-emergency doctrine as applied to both Metz and Rath. Inasmuch as the court had found Metz negligent as a matter of law in failing to yield the right of way, the jury should not have been instructed that the emergency doctrine might be considered in determining Metz's causal negligence.

In *Ackley v. Farmers Mut. Automobile Ins. Co.* (1956), 273 Wis. 422, 425, 78 N. W. (2d) 744, this court stated:

"It was erroneous to submit the case so as to permit the jury to give the respondent the benefit of the emergency rule, because, upon the record before us, it appears that no emergency such as would excuse the respondent's act existed. His driving with his left wheels over the center of the road as he blindly ascended the hill placed him in a position which resulted in his contributing toward the result. *One cannot*

*deliberately proceed to a point of danger, and then act within the protection that a sudden emergency might otherwise give him."* (Emphasis supplied.)

We deem that the foregoing quotation is directly applicable to the facts of this case. Metz placed himself in a position of danger in attempting to cross the highway instead of yielding the right of way to the oncoming Rath station wagon. A jury should not be told in such a situation that they may find the pedestrian free from negligence because of his having been confronted with a sudden emergency: This is because the emergency was of his own creation.

Furthermore, the trial court having answered the question as to Metz being negligent with respect to yielding the right of way, the only remaining question inquiring with respect to possible negligence on Metz's part related to lookout. Failure on Metz's part to make a proper observation for approaching traffic coming from the south before stepping onto the paved portion of the roadway would of necessity contribute to produce the emergency. We consider most pertinent the following extract from the opinion of this court in *Whirry v. Rural Mut. Casualty Ins. Co.* (1954), 267 Wis. 302, 308, 64 N. W. (2d) 841:

"The appellants also contend that the defendant Arnold .Whirry was confronted by a sudden emergency and, therefore, he should not be held causally negligent with respect to lookout. If his negligence in that respect contributed to the emergency, then he is not entitled to the benefit of the emergency rule."

*By the Court.*—Judgment reversed, and cause remanded with directions for a new trial.